IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| ANDERSON TOWING, LLC, | CV 25–37–BLG–DWM |
| Plaintiffs, | |
| vs. | OPINION and ORDER |
| RICH ST. JOHN, in both his individual and official capacity as Chief of Police for the City of Billings, | |
| Defendant. | |

In February 2025, the Billings Police Department permanently removed Plaintiff Anderson Towing, LLC ("Anderson" or "Anderson Towing") from its tow truck rotation system. In doing so, Anderson alleges that the Department, through the actions of Defendant Chief of Police Rich St. John, violated Anderson's procedural due process rights under both the federal and Montana constitutions. (Doc. 1.) On the present motion for preliminary injunction, Anderson requests that it be placed back on the tow rotation during the pendency of this lawsuit. (Doc. 6.) A hearing on this motion was held on May 7, 2025, in Butte, Montana. Based on the parties' filings and oral argument, Anderson's request for preliminary injunctive relief is granted.

1

## BACKGROUND

In deciding a motion for preliminary injunction, a district court is permitted to consider the parties' pleadings, declarations, affidavits, and exhibits submitted in support of and in opposition to the application, including hearsay statements. *See, e.g., Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988). Here, the relevant filings include Anderson's Complaint and its attachments, (Docs. 1, 1-1, 1-2, 1-3, 1-4); Chief St. John's Answer, (Doc. 16); three declarations submitted by Anderson, (Docs. 3, 4, 5); three declarations submitted by Chief St. John, (Docs. 15-1, 15-2, and 15-3); and email correspondence submitted by Anderson, (Docs. 17-2, 17-3). No additional testimony or evidence was presented at the motion hearing.

## I.    Montana's Tow Rotation Framework

Pursuant to the Montana Professional Tow Truck Act, the Montana Department of Justice is required to "establish and maintain an equitable rotation system among qualified tow truck operators." Mont. Code Ann. § 61-8-908(1); *see also* Mont. Code Ann. § 61-8-902(4) (describing the purpose of the Act as to, *inter alia*, "establish[] a uniform and equitable qualification system . . . and a system for the fair consideration of all qualified tow truck companies"). That system: "(a) must be administered by the highway patrol in a manner that will give priority to public safety; (b) must be based on the classification of equipment provided in

2

[§] 61-8-905; and (c) may include only qualified tow truck operators." Mont. Code Ann. § 61-8-908(1).

"Complaints about the rotation system must be referred in writing to the complaint resolution committee established in [§] 61-8-912." Mont. Code Ann. § 61-8-908(11). This Committee, known as the Tow Truck Complaint Resolution Committee, Admin. R. Mont. § 23.6.101(6), is administered by the Office of Consumer Protection, *see* Admin. R. Mont. § 23.6.106. "The committee shall meet as often as necessary, either in person or by teleconference, to review and resolve complaints about tow truck issues, including towing charges, that are submitted in writing to a committee member and to review information submitted to it as provided in this part." Mont. Code Ann. § 61-8-912(2). Pursuant to the Act's implementing regulations, written complaints may be forwarded to the Committee in specific situations and, if so,

the committee will:

(a) give all parties to the dispute reasonable notice of the date, time, and location at which the committee will hear the complaint;

(b) request notification by any party of its desire to call witnesses, and the proposed subject of the witnesses' testimony;

(c) provide the complaining party an opportunity to address the committee regarding his or her complaint;

(d) provide the responding party an opportunity to answer the complaining party;

3

(e) provide any other party an opportunity to address the committee regarding the complaint;

(f) provide any witness the committee deems relevant an opportunity to address the committee; and

(g) keep a tape recording of the hearing that may be copied or transcribed at the request of any person who pays the cost thereof.

Admin. R. Mont. § 23.6.106(6); *see* Mont. Code Ann. § 61-8-912(3).

If after a hearing the committee finds the complaint to have merit, the committee may: (a) issue a warning; (b) suspend the operator from participating in the state rotation system for six months; (c) permanently suspend the operator from participating in the state rotation system; or (d) issue some other sanction that a majority of the committee agrees is appropriate.

Admin. R. Mont. § 23.6.106(8.)  That decision is then subject to judicial review.

Admin. R. Mont. § 23.6.106(9); Mont. Code Ann. § 2-4-702.

"A local law enforcement agency may adopt and administer a local law enforcement rotation system that complies with the [Act]." Mont. Code Ann. § 61-8-908(9).  According to the Billings Police Department, " [t]he City has . . . never adopted the procedures provided for in the State code for the State tow list system. The Police Department uses a tow rotation on a purely discretionary basis." (Doc. 15-3 at ¶ 13.)

## II.   Anderson Towing

In October 2024, Anderson Towing was suspended from the state tow rotation for six months, (*see* Doc. 1-1), and, in February 2025, it was permanently

4

removed from the Billings Police Department's tow rotation, (*see* Doc. 1-4).
While only the latter decision is at issue in this case, a brief description of both
events is included below because, according to Chief St. John, Anderson's state
suspension set the stage for its permanent removal from the Billings rotation list.

### A.    State Suspension

In April 2024, the Montana Office of Consumer Protection received a
complaint from Kenyon Noble Lumber and Hardware against Anderson in Gallatin
County. (*See* Doc. 1-1 at 3.) Kenyon alleged that Anderson had improperly
charged it $6,754.66 for a rotation tow truck job. (*Id.* at 4.) The Tow Truck
Complaint Resolution Committee held a contested hearing in September 2024.
(*See id.* at 5.) After hearing testimony, the Committee issued its Findings of Fact,
Conclusions of Law, and Decision, concluding that "[t]he total amount charged
[wa]s wholly unreasonable and unnecessary." (*Id.* at 15.) The Committee was
critical of Anderson for charging "for unnecessary services and [an] unreasonable
amount for the services provided." (*Id.* at 15–16.) Relevant here, the Committee
noted that Kenyon was charged $500 for "traffic control signs, cones and warning
lights" when no such services were provided. (*Id.*) The Committee suspended
Anderson from the state rotation system for a period of six months beginning
November 1, 2024, and ending April 30, 2025. (*Id.* at 16.)

Anderson's state suspension did not automatically attach to local law enforcement tow rotations. (*Id.* at 1.) Local offices were informed that they could remove Anderson from their rotation "as they see fit, that is their choice and determination to make at the local level, per legal advice." (*Id.*) According to Shawn Mayo, the Assistant Chief of Police for the Billings Police Department, the Department decided to suspend Anderson for only two weeks beginning November 1 2024, but that "[t]he Department decided that it would decide whether Anderson Towing should remain on the City's list." (Doc. 15-1 at ¶¶ 5, 6.)

### B.    Removal from the Billings Police Department's Rotation

On February 8, 2025, Anderson received a tow rotation call from the Billings Police Department for a Mercedes Benz that had been involved in a traffic accident. (Doc. 1 at ¶ 23.) Anderson picked up the vehicle and took it to its office 6.2 miles away. (*See* Doc. 1-2 at 3.) Two days later, Russell Fagg, a former state district judge, arrived at Anderson's office to retrieve the Mercedes, (Doc. 1 at ¶ 25), which belonged to his father, (*id.* ¶ 31). When Fagg arrived at the office, he was rude to the office staff after he was told he could only pay in cash or with a cashier's check. (*Id.* ¶¶ 26–30.) Fagg was also informed that the Mercedes' registration was expired and that the vehicle could not be released without a valid registration. (*Id.* ¶¶ 31–33.) As a result, Fagg agreed to pay a $100 fee to retrieve an updated registration, which was ultimately reflected on his invoice as a "Lien

Processing Fee." (*Id.* ¶¶ 34–35.) Fagg left the office to retrieve payment, returning twenty minutes later. (*Id.* ¶ 40.) He then grudgingly paid his invoice, which totaled $1,737.47:

| Storage charges | | | |
|---|---|---|---|
| | Quantity | Price | Line Total |
| [Storage - Storage Fees] Impounds/Storage. Daily Impound Rate | 3 | $75.00 | $225.00 |
| Towing charges | | | |
| | Quantity | Price | Line Total |
| [Towing] Call Out | 1 | | $150.00 |
| [Towing] Tow/Hook Fee | 1 | $150.00 | $150.00 |
| [Towing] Traffic Control Signs, Cones, Warning Lights | 1 | $350.00 | $350.00 |
| [Towing] Mileage | 6.2 | $500.00 | $500.00 |
| [Towing] Fuel Surcharge | 1 | $8.00 | $49.60 |
| [Towing] Gate Fee | 1 | $79.92 | $79.92 |
| [Towing] Lien Processing Fee | 1 | $125.00 | $125.00 |
| [Towing] Admin Fee | 1 | $100.00 | $100.00 |
| | | $157.95 | $157.95 |
| | | Towing SubTotal | $1,512.47 |
| | | Storage - Storage Fees SubTotal | $225.00 |
| | | Subtotal | $1,737.47 |
| | | Taxes | $0.00 |
| | | Grand Total | $1,737.47 |
| | | Amount Due: | $0.00 / Paid |
| | Cash payment of $1,737.47 applied on 2/10/2025 | | |

(*See* Doc. 1-2 at 3.)

On February 8, 2025, Fagg submitted a complaint against Anderson to the City of Billings, citing his concerns over "price gouging." (*See* Doc. 1-3.) After outlining his version of events, Fagg "urge[d] the City to remove Anderson Towing from the rotation list." (*Id.* at 2.) After Fagg filed his complaint, Anderson states that its General Manager, Bryce Saunders, called Fagg and offered to refund the $500 "traffic control signs, cones, warning lights" charge. (*See* Doc. 4 at ¶ 9.) Fagg disputes this statement and claims that while Saunders called him, Saunders did not offer a refund but instead asked "whether [Fagg] wanted to settle [his] complaint." (Doc. 15-2 at ¶ 14.) Fagg further states that he has not been refunded the $500 despite Anderson's recognition that it was improperly charged.

7

(*See id.*; *see also* Doc. 4 at ¶ 8 (Saunders admitting that "a $500 charge for traffic control devices . . . had been erroneously included on [Fagg's] bill").)

On February 25, 2025, Anderson received a letter from Chief St. John notifying it that Anderson had been permanently removed from the Billings Police Department tow rotation system for "excessive invoices." (*See* Doc. 1-4.) Chief St. John cited the Kenyon Findings and state suspension and indicated that the City of Billings was concerned that "the owner of Anderson Towing found no issue with its billing practices after comparing how other tow truck companies in Montana charge." (*Id.* at 1–2.) Chief St. John further explained that the City of Billings had made a public records request to the Department of Justice regarding other complaints filed against Anderson by Billings residents, and discovered complaints citing "inconsistencies in disclosing prices, inconsistencies in pick up hours, unreasonable charges . . . , and overcharges ($500 traffic control, $100 lien processing fee)." (*Id.* at 2–3.) According to Chief St. John, "Anderson Towing was on notice as of October 21, 2024, (date of the Kenyon Findings) that it was charging unreasonable and unnecessary charges to citizens of Billings. Anderson Towing did *not* stop making these charges as demonstrated by a subsequent complaint received the City of Billings related to Anderson Towing on February 10, 2025, [the Fagg Complaint]." (*Id.* at 3.) Chief St. John explained that "[t]he Billings Police Department adopted a local law enforcement rotation system in the

8

City of Billings. Mont. Code Ann. § 61-8-908(9). The City of Billings and the Billings Police Department (administrator of local rotation system) cannot allow Anderson Towing to unnecessarily and unreasonably charge Billings citizens for tow services." (*Id.*) As a result, "Anderson Towing [wa]s removed from Billings' local rotation system, effective" February 25, 2025. (*Id.*) According to Chief St. John, "[t]his decision is permanent and will not be reconsidered for the reasons stated [in the letter], including a willful and consistent failure by Anderson Towing to treat Billings citizens in a fair and equitable manner consistent with recognized tow truck standards." (*Id.*)

## III.    The Present Case

On March 26, 2025, Anderson sued Chief St. John, alleging that the decision to permanently remove it from the Billings tow rotation violated Anderson's procedural due process rights under both the Fourteenth Amendment to the United States Constitution and Article II, § 17 of the Montana Constitution. (*See* Doc. 1.) According to Anderson, Fagg used his prior position as a state district judge and his close relationship with the Billings Police Department to get Anderson removed from the rotation. (*See id.*) Anderson seeks injunctive relief in the form of reinstatement on the Billings tow rotation and a prohibition against bypassing it on future rotations. (*Id.* at 17.) Anderson also seeks monetary damages, fees, and costs. (*Id.*) On April 2, 2025, Anderson filed the present

motion for preliminary injunctive relief, asking that it be put back on the Billings tow rotation list during this litigation. (Doc. 6.) Chief St. John opposes. (Doc. 15.) On May 7, 2025, a motion hearing was held in Butte, Montana.

ANALYSIS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Accordingly, a preliminary injunction should only be entered "upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. To succeed on its request, Anderson must show that: (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief;" (3) "that the balance of equities tips in [its] favor," and (4) " that an injunction is in the public interest." *Id.* at 20. The Ninth Circuit has adopted an alternative sliding scale approach, in which the elements are balanced, "so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Specifically, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132 (internal quotation marks omitted). Because Anderson has met its burden, its request for preliminary injunctive relief is granted.

10

## I.      Likelihood of Success

To prevail on a motion for preliminary injunction, a plaintiff must show either a likelihood of eventual success on the merits or, under the Ninth Circuit's "sliding scale" test, serious questions going to the merits of their claims. *Winter*, 555 U.S. at 20; *Alliance for the Wild Rockies*, 632 F.3d at 1132. Under the Due Process Clause of the Fourteenth Amendment, "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend XIV, § 1. Likewise, under the Montana Constitution, "[n]o person shall be deprived of life, liberty, or property without due process of law." Mont. Const., art. 2, § 17. Procedural due process claims have two elements: "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a "denial of adequate procedural protections." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998); *accord Mont. Media, Inc. v. Flathead Cnty.*, 63 P.3d 1129, 1141 (Mont. 2003). Anderson argues that it is likely to succeed on the merits of "its due process claim because it was permanently removed from [the Billings Police Department]'s rotation list without *any* notice or an opportunity to be heard[.]" (Doc. 7 at 8.) In response, Chief St. John argues that Anderson cannot succeed because it fails to meet the first element of a due process claim; i.e., it fails to show that it has a protected property interest in being on the Billings tow rotation list. Anderson has the better argument.

11

To succeed on its due process claim, Anderson must first show that it has a protectable property interest in remaining on the Billings Police Department's rotation list. A property interest is "more than an abstract need or desire" or a "unilateral expectation"; rather, a person must have a "legitimate claim of entitlement" to the benefit at issue. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Property interests "are not created by the Constitution[,]" but instead are "defined by existing rules or understandings that stem from an independent source such as state law." *Id.*; *see Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005); *United States v. Guillen-Cervantes*, 748 F.3d 870, 872 (9th Cir. 2014). To create an entitlement to a benefit, an independent source, such as state law, must establish and define the contours of that benefit. *Roth*, 408 U.S. at 577. When the law "contains mandatory language that restricts the discretion" of the body administering the benefit, it is more likely that the benefit is a protected property interest. *Kraft v. Jacka*, 872 F.2d 862, 868 (9th Cir. 1989) *abrogated on other grounds by Dennis v. Higgins*, 498 U.S. 439, 442 n.2 (1991). On the other hand, if a statute gives the administering body broad authority to act with regard to the benefit, then the plaintiff is less likely to establish that he or she is entitled to that benefit. *Id.* "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit

12

understandings that support his claim of entitlement to the benefit and that he may

invoke at a hearing." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972).

In the context of tow truck rotations specifically,

> [w]here a court has found a property interest in remaining on a rotation
> list, the plaintiff has alleged a claim of entitlement supported or created
> by a formal and settled source such as a state statute or regulatory
> scheme. Absent such an entitlement grounded in state law, courts have
> not found a protected property interest in remaining on a wrecker
> rotation list.

*Blackburn v. City of Marshall*, 42 F.3d 925, 938 (5th Cir. 1995) (surveying

caselaw from the Second, Third, Fourth, Fifth, Seventh, Tenth, Eleventh Circuits).

Consistently, there is no protectable property interest in a rotational scheme that is

based solely on the existence of a local, discretionary policy. *See id.* at 940–41;

*Morley's Auto Body, Inc. v. Hunter*, 70 F.3d 1209, 1214 (11th Cir. 1995); *Lucas v.*

*Monroe Cnty.*, 203 F.3d 964, 978 (6th Cir. 2000). Thus, the existence of a

protected property right here turns on whether the Billings Police Department's

tow rotation system is rooted in state law.

The Montana Professional Tow Truck Act states: "[a] local law enforcement

agency may adopt and administer a local law enforcement rotation system that

complies with" the state regime. Mont. Code Ann. § 61-8-908(9). According to

Anderson, this means that while the local decision to adopt a tow rotation list is

discretionary under Montana law, once such a list is adopted, it must be

administered in compliance with the Act. Chief St. John disagrees, emphasizing

13

that there is a difference between the state's rotation list and the local rotation list administered by the Billings Police Department. According to Chief St. John, the Billings rotation list is entirely discretionary and therefore confers no entitlement to a benefit. At this stage of the proceeding, Anderson has the better argument.

The limited record in this case shows that Billings had adopted a tow rotation system under § 61-8-908(9). To be sure, in his declaration, Chief St. John states that Billings has "never adopted the procedures provided for in the State code for the State tow list system. The Police Department uses a tow rotation list on a purely discretionary basis." (Doc. 15-3 at ¶ 13.) However, this litigation position is contradicted by both his prior statements and the actions of the Department. First, the February 25, 2025 letter Chief St. John sent to Anderson removing it from the tow list explicitly states: "The Billings Police Department adopted a local law enforcement rotation system in the City of Billings. Mont. Code Ann. § 61-8-908(9)." (Doc. 1-4 at 3.) As argued by Anderson, this is an explicit admission by the City that it adopted a rotation system subject to Montana's state statutory scheme.

Second, there is no real dispute that despite disavowing a "tow system," the Billings Police Department uses a formal, rotational list to call for tow trucks. According to Chief St. John, because the creation of that list was discretionary under state law, its existence cannot give rise to a protected property interest. Not

14

so.  Chief St. John is indeed correct that courts have routinely found that a

protectable property interest is not created simply because a local entity creates,

administers, or uses a local tow rotation.  *See Morley's*, 70 F.3d at 1213–15;

*Blackburn*, 42 F.3d at 936–41.  In *Morley's*, for example, the plaintiffs

unsuccessfully relied on the local "sheriff's wrecker rotation policy itself for the

creation of the alleged property right."  70 F.3d at 1214.  The Eleventh Circuit

held:

> [t]heir reliance is misplaced, because there is no Florida state law
> authority that elevates that policy to the status of a regulation with the
> force of law.  The policy was issued in the sole discretion of the Collier
> County Sheriff and no state agency with statutory authority to do so has
> authorized the sheriff to create the entitlement the plaintiffs urge us to
> recognize. Because any expectations arising from the wrecker rotation
> policy of a county sheriff are not grounded in Florida law, such a policy
> does not give rise to a constitutionally protected property interest.

*Id.* (footnote omitted).  Here, however, Anderson does not seek to rely on the mere

existence of a local system to invoke a property interest; rather, the property

interest is one created by state law through Montana Code Annotated § 61-8-

908(9).  Pursuant to that statute, while the decision to adopt a local tow rotation

system is discretionary, its administration is not; it must be done in compliance

with the Act.  This interpretation is reinforced by the statutory language itself,

which further provides that "[a] tow truck driver desiring to be placed on the local

law enforcement rotation system must be a qualified tow truck operator as

provided in this part."  Mont. Code Ann § 61-8-908(9).  That language

15

demonstrates a "mutually explicit understanding[]" that in return for operating an equitable system consistent with state law, local entities have the benefit of using only qualified operators. *Perry*, 408 U.S. at 601.

Accordingly, based on the current record and the language of the Montana Professional Tow Truck Act, Anderson has shown the likely existence of a protected property interest.

To succeed on its due process claim, Anderson must also show a "denial of adequate procedural protections." *Brewster*, 149 F.3d at 982. As reflected in the record, Chief St. John permanently removed Anderson from the Billings tow rotation without prior notice or an opportunity to be heard. (*See* Doc. 1-4.) As such, Chief St. John does not even argue that adequate process was provided. (*See generally* Doc. 15.) To the contrary, defense counsel indicated at the May 7 hearing that neither the City nor the Police Department has any procedures in place to review or adjudicate complaints against tow truck companies. Thus, at this stage of the proceeding, Anderson has shown the second element of a procedural due process claim is met.

Based on the foregoing, Anderson has, at a minimum, raised serious questions going to the merits of its due process claim. *Alliance for the Wild Rockies*, 632 F.3d at 1132. That said, the record has not been meaningfully developed. For example, while defense counsel outlined his understanding of the

16

Billings tow system—a list administered by a third party as provided by a local

tow association[1]—none of that information is actually in the record, nor was it

relied on herein.

## II.    Irreparable Harm

To obtain a preliminary injunction, a plaintiff must allege more than the

possibility of harm. *Winter*, 555 U.S. at 22. A plaintiff must demonstrate that

absent such an order, irreparable harm is *likely*. *Id.* "Irreparable harm is

traditionally defined as harm for which there is no adequate legal remedy, such as

an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068

(9th Cir. 2014). Here, Anderson argues that the denial of relief will result in

irreparable harm in the form of an ongoing constitutional violation, a direct loss of

revenue, and a loss of competitive advantage. Chief St. John argues that none of

these alleged harms meets the requirements of "irreparable harm" due to the

availability of money damages in this context. Ultimately, Anderson has shown

irreparable harm in the form of constitutional injury.

### A.    Constitutional Injury

The showing of a constitutional violation "usually demonstrates [the

plaintiff] is suffering irreparable harm." *See Baird v. Bonta*, 81 F.4th 1036, 1040

---

[1] In *Blackburn*, for example, a wrecker association ran the local rotation tow list
and the local government played no role in either its administration or the selection
of the on-call tow truck. 42 F.3d at 903.

(9th Cir. 2023). Indeed, if a plaintiff shows that it is likely to prevail on the merits of a constitutional question, "that showing will almost always demonstrate he is suffering irreparable harm as well." *Id.* at 1042. "Accordingly, when an alleged deprivation of a constitution right is involved, . . . most courts hold that no further showing of irreparable injury is necessary." *Id.* (internal citation and quotation marks omitted). Chief St. John argues this is not the case here because the constitutional injury at issue, a due process violation regarding the business operation of a single entity, can be remedied by monetary damages. That, according to Chief St. John, makes this case distinguishable from constitutional challenges that merely seek injunctive or declaratory relief. But the fact that a party could be compensated for a constitutional injury does not make that continuing injury any less irreparable from a constitutional perspective. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, Anderson has shown irreparable harm.

**B.    Loss of Revenue and Competitive Advantage**

To be clear, Anderson's other arguments regarding irreparable harm fail. According to Anderson, its removal "from the tow rotation list is having a significant financial impact on the company" as it "previously derived

18

approximately 15% of its business from participation on the [Billings] rotation list, amounting to approximately $52,000 in revenue per month." (Doc. 3 at ¶¶ 21, 22.)

Economic harm is generally not considered irreparable, as it can be addressed through monetary damages. *Rent-A-Center, Inc. v. Canyon Tel. & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury . . . . The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). Anderson presents no evidence or argument for why it could not seek its lost revenue in the form of monetary damages.

Finally, Anderson argues that its removal from the Billings tow rotation list will result in a competitive disadvantage, as its competitors will both receive tow rotation calls as well as any follow-up business that results from those calls. As indicated above, while loss of business is generally compensable with monetary damages, courts have found that a loss of potential customers or goodwill can constitute irreparable harm. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Herb Reed Enters., LLC v. Fl. Ent't Mgm't, Inc.*, 736 F.3d 1239, 1250

19

(9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm."). Thus, whether Anderson has met its burden as to this element comes down to what evidence it has produced to show such harm here. Ultimately, Anderson fails to "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

According to Anderson's Department of Transportation Compliance Manager Robert Lehm, "customers initially served through [Billings] rotation calls often return to Anderson Towing for future towing needs," and "[r]otation calls that would have been assigned to Anderson Towing are now being directed to its competitors." (Doc. 3 at ¶¶ 23, 24.) Lehm further avers that "[i]f Anderson Towing is not reinstated on the [Billings] tow rotation list promptly, the company will be forced to lay off employees and may ultimately go out of business." (*Id.* ¶ 25.) But Anderson presents no further information regarding how many customers are gained from the rotation system or how many rotation calls are even fielded in a particular month. Nor does Anderson present any evidence of its operating expenses or state how many employees or trucks it currently has. As it relates to the competition, Anderson presents no evidence of how many other tow companies are on the rotation or what sort of business they do. The fact that competing tow businesses will take Anderson's rotation calls merely shows a possibility of irreparable harm related to Anderson's competitiveness in the

Billings tow market; it is insufficient to show a *likelihood* of irreparable harm

without additional evidence. *See Goldie's Bookstore, Inc. v. Superior Ct. of St. of

Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) ("[T]he court determined that [the plaintiff]

would lose goodwill and 'untold' customers. This finding, not based on any

factual allegations, appears to be speculative. Speculative injury does not

constitute irreparable injury."). Anderson has not presented sufficient evidence to

show irreparable harm based on a loss of competitive advantage.

### III. Balance of Equities and Public Interest

Under the "balance of the equities" analysis, a court "must balance the

competing claims of injury" and "consider the effect on each party of the granting

or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quotation marks

omitted). The public interest inquiry, by contrast, "primarily addresses impact on

non-parties rather than parties." *League of Wilderness Defs./Blue Mtns.

Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). When the

government is a party, the analyses on the final two elements merge. *Drakes Bay

Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Here, Anderson argues that both factors weigh in its favor "as courts

consistently recognize that the public interest is best served by 'prevent[ing] the

violation of a party's constitutional rights.'" (Doc. 7 at 13 (quoting *Melendres*,

695 F.3d at 1002).) Indeed, "plaintiffs who are able to establish a likelihood that a

policy violates the U.S. Constitution have also established that both the public interest and the balance of equities favor a preliminary injunction." *Baird*, 81 F.4th at 1042 (internal quotation marks and alterations omitted). However, this is a close call here because it not clear that Chief St. John's decision to terminate a single business's membership in a rotational tow list has the same sort of public impact as a purportedly unconstitutional statute with broad applications. In *Baird*, for example, the plaintiffs sought to enjoin California's enforcement of a "statewide ban on open carry" of handguns. 81 F.4th at 1039. Thus, the injunctive relief requested and the underlying constitutional question affected the public as whole. In contrast, the only question here regards Anderson's placement on the Billings rotation list. While Anderson's due process challenge could have implications for other companies or the public, the direct challenge itself is very narrow. Moreover, Chief St. John has invoked a public interest in preventing Anderson from overcharging the public for rotational tow jobs, an allegation that is supported by the limited record. Ultimately though, given the ongoing constitutional violation, *Baird* compels the conclusion that injunctive relief is warranted. *See* 81 F.4th at 1042.

## IV.    Bond

If an injunction is granted, the plaintiff is required to post security "in an amount that the court considers proper to pay the costs and damages sustained by

22

any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). District courts have wide discretion in determining the amount of bond. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005). In public interest litigation, "requiring nominal bonds is perfectly proper," *id.*, and "[c]ourts routinely impose either no bond or minimal bond in public interest . . . cases." *City of S. Pasadena v. Slater*, 56 F. Supp. 2d 1106, 1148 (C.D. Cal. 1999). Here, a bond is not required because restoring Anderson to the Billings tow rotation list during the pendency of this litigation will not cost the City of Billings anything. To the extent that Chief St. John is concerned about Anderson overcharging its residents, such concerns may be addressed through private complaints.

## CONCLUSION

Based on the current record, IT IS ORDERED that Anderson's motion for a preliminary injunction (Doc. 6) is GRANTED. Chief St. John is directed to place Anderson Towing back on the City's tow rotation pending the final resolution of this case on the merits.

DATED this 9th day of May, 2025.

10:14 A.M.

_____
Donald W. Molloy, District Judge
United States District Court

23